Celeste MATTHEIS, a child, by her Guardian ad Litem, Michael J. Vowinkel, David Mattheis and Stephanie Mattheis, Plaintiffs,

v.

HERITAGE MUTUAL INSURANCE COMPANY, Defendant-Appellant,

MIDWESTERN NATIONAL INSURANCE COMPANY, Defendant-Respondent,

David J. BARTS and Blue Cross & Blue Shield United of Wisconsin, Defendants.

Court of Appeals

*No. 91-2070. Oral argument May 11, 1992.—Decided June 10, 1992.*

(Also reported in 487 N.W.2d 52.)

On behalf of the defendant-appellant, there were briefs and oral argument by *Robert C. Hahn* of *Holden & Hahn, S.C.* of Sheboygan.

On behalf of the defendant-respondent, there was a brief and oral argument by *Thomas L. Miller* of Wauwatosa.

Before Nettesheim, P.J., Brown and Snyder, JJ.

SNYDER, J. The ultimate issue on appeal is which of two insurers is liable for damages incurred as the result of an automobile accident in which a car driven by David Barts struck Celeste Mattheis. To resolve the issue, we must determine whether seventeen-year-old David was a "customer" of Jacoby-Modra Chevrolet, Inc. within the meaning of Jacoby-Modra's garage liability policy. Heritage Mutual Insurance Company, Jacoby-Modra's insurer, argues that it is not liable because David was a customer with other available insurance. The trial court determined, however, that David was not a customer and that Heritage had primary insurance responsibility. We disagree and reverse.

Margery Barts, David's mother, owned an automobile insured by Midwestern National Insurance Corporation. As a matter of course, David drove the car to school and transported his mother to and from work. When the car needed repair or servicing, David would take the car to Jacoby-Modra, sign the repair orders and loaner car agreements, and leave with the loaner car.

On October 28, 1988, at his mother's direction, David took Margery's car to Jacoby-Modra for repairs and, as he had done before, signed the loaner car agreement in the space designated "Customer." A week later, while on his way with the loaner to pick up his mother from work, David struck and injured seven-year-old Celeste.

Celeste and her parents brought a personal injury suit against David, Heritage, Midwestern and Blue Cross and Blue Shield United of Wisconsin (BCBS). BCBS

719

cross-claimed for its subrogated interest. Heritage moved for summary judgment on the issue of coverage. The court refused to rule as a matter of law that David was a customer of Jacoby-Modra and denied the motion. A jury trial was scheduled for mid-June 1991.

On June 3, Celeste and her parents moved for a declaratory judgment. They sought a declaration that, as a matter of law, David was not a customer of Jacoby-Modra and a determination of whether, in the event she prevailed at trial, Heritage or Midwestern had primary policy responsibility or whether the insurers were jointly responsible. The trial court determined that David was not a customer and that Heritage had primary coverage. As a result, Midwestern would not have to contribute unless Heritage first exhausted its limits of liability. After trial, the jury returned a verdict against Heritage and judgment was entered on the verdict. Heritage appeals.

The issue is what the word "customer" means and, more particularly, whether the contracting parties intended that one such as David would be a "customer."

This determination requires that we construe the insurance contract. That task presents a question of law. *Keane v. Auto-Owners Ins. Co.,* 159 Wis. 2d 539, 547, 464 N.W.2d 830, 833 (1991). Whether ambiguity exists in a contract also is a question of law. *Kremers-Urban Co. v. American Employers Ins. Co.,* 119 Wis. 2d 722, 735, 351 N.W.2d 156, 163 (1984). We review questions of law without deference to the trial court. *Keane,* 159 Wis. 2d at 547, 464 N.W.2d at 833. We construe insurance contracts using the same principles of law applicable to other contracts. *Kremers-Urban Co.,* 119 Wis. 2d at 735, 351 N.W.2d at 163.

The Midwestern policy and the Heritage policy each provides coverage for obligations of its insured resulting from an automobile accident causing bodily injury or property damage. Margery's Midwestern policy covers Margery "or any family member" using a "covered auto." A covered auto includes:

> [a]ny auto . . . while used as a temporary substitute for any other vehicle . . . which is out of normal use because of its:
>
> a. breakdown;
>
> b. repair;
>
> c. servicing;
>
> d. loss; or
>
> e. destruction.

The Heritage policy promises to pay "all sums an insured legally must pay as damages because of bodily injury . . . to which this insurance applies caused by an accident and resulting from garage operations." A customer is not an insured unless he or she "[h]as no other available insurance 'whether primary, excess or contingent.' " The policy does not define "customer."

The trial court concluded that David was not a customer because

> Webster's New World Dictionary, second college edition, 1982 copyright, defines customer as "a person who buys," and the Court underscores buys, "especially one who buys from, or patronizes, an establishment regularly."

The court emphasized that Margery was the customer because she, not David, purchased services from Jacoby-Modra, was responsible for the loaner, and was obligated to pay for the services on her car.

Midwestern indulges in a similar analysis. Midwestern asserts that Margery is the customer because she was the title owner of the vehicle under repair and the one obliged to pay for its servicing. Midwestern maintains that David, a minor, was nothing more than a "go-fer" on his mother's behalf and cannot be transformed into a customer simply by having signed for the loaner vehicle.

Heritage, by contrast, contends that the trial court and Midwestern take too narrow a view of the commonly understood meaning of "customer." Heritage asserts that in addition to "purchaser," "customer" also means one who regularly patronizes an establishment or uses its goods or services.

A term is not ambiguous merely because it is general enough to encompass more than one option. *Wilke v. First Fed. Sav. & Loan Ass'n,* 108 Wis. 2d 650, 654, 323 N.W.2d 179, 181 (Ct. App. 1982). Broad terms may be used to permit flexibility in the choice of methods available without creating an ambiguity. *Id.* Bearing in mind that the dispute over the meaning of the word is not between the garage and its insurer, we seek to ascertain its meaning by looking to the intent of the contracting parties—*i.e.,* the coverage Heritage intended to provide and for which Jacoby-Modra paid. *See Lawver v. Boling,* 71 Wis. 2d 408, 422, 238 N.W.2d 514, 521 (1976). The intention of the parties is the controlling guide in interpretation of a contract. *Faltersack v. Vanden Boogard,* 39 Wis. 2d 64, 68, 158 N.W.2d 322, 324 (1968). We conclude that "customer" is not ambiguous and that the contracting parties chose the word to broadly describe a type of risk they meant to exclude.

This court addressed an analogous situation in *Quinlan v. Coombs,* 105 Wis. 2d 330, 314 N.W.2d 125 (Ct. App. 1981). *Quinlan* involved a "drive-other cars"

clause. A "drive-other cars" clause extends the driver's regular insurance to casual driving of cars other than his or her own without payment of an extra premium and excludes coverage for "residents of the same household." The issue was whether an unmarried cohabiting couple were "residents of the same household" for policy exclusion purposes. This court stated:

> People who live in [such a] close relationship . . . and have the opportunity to use other cars frequently should not expect protection without paying for it. It is the closeness, and not simply the blood, marriage or adoption tie, that results in the probability of two or more automobiles being used interchangeably. . . . We conclude that public policy is enhanced by permitting insurance companies to exclude coverage in those close relationship situations where an insured is driving or has the opportunity to drive cars interchangeably rather than by merely casual use. Because a relationship between people, whether married or unmarried, can bring about the opportunity to interchange cars frequently, the insurance policy can properly exclude protection for unmarried residents driving each other's cars.

*Id.* at 336, 314 N.W.2d at 128–29.

The *Quinlan* rationale illustrates that when an insurer writes an exclusion in a liability policy it generally directs the exclusion at a *risk,* not a person's status. The risk sought to be excluded in this case was the permissive use of garage vehicles by "customers" with their own liability insurance. The "customers" exclusion reasonably extends to whomever permissively drives the loaner if that use is consistent with the use of the vehicle being replaced.

We conclude David is a customer within the meaning of the Heritage policy. He commonly drove the family car and as a matter of course transported his mother to and from work. Jacoby-Modra loaned a car to replace the Barts' family auto. In this case, as in many involving a loaner to replace the family car, it was understood that a person other than the financially obligated one would drive the car. It is reasonable to assume that the parties to the insurance contract contemplated that a loaner would be used in the same manner as the vehicle it replaced. When this accident with the loaner occurred, David in fact was on his way to pick up Margery from work, just as he routinely had done with the family car. This is precisely the type of risk the parties sought to exclude when they wrote the contract excluding coverage to "customers" with other available insurance. We disagree that either the insurer or the insured meant to exclude Margery from coverage while affording coverage to David, or that either meant for coverage to turn on the nature of contacts with David.

The approach advanced by the trial court and Midwestern places too great an emphasis on defining a customer as a particular person rather than as a contemplated risk. To adopt that approach for family situations like this would result in a cumbersome, uncertain, *ad hoc* determination of who is a customer. Thus, despite the parties' disagreement, we conclude that the term "customer" is not ambiguous. When the terms of a policy are plain on their face, the policy should not be rewritten by construction to bind the insurer to a risk it was unwilling to cover, and for which the insured did not pay. *Garriguenc v. Love,* 67 Wis. 2d 130, 135, 226 N.W.2d 414, 417 (1975).

Our answer necessarily impacts on the question of which of the two insurers has primary insurance coverage. Based on its determination that David was not a customer, the trial court concluded prior to trial that Heritage had primary insurance responsibility and that Midwestern would bear responsibility only for a damage award in excess of the policy limits. Since the jury verdict resulted in a judgment less than the limits of either policy, Heritage was required to pay the entire judgment.

Despite its exclusion clause, the Heritage policy would be bound to provide coverage if its customer is without other available insurance. Other available insurance exists here, however, through Midwestern. The Midwestern policy promises to "pay damages for bodily injury . . . for which any covered person becomes legally responsible because of an auto accident." Margery is a covered person under her policy, as is David, a "family member." The Midwestern policy also covers a replacement vehicle "used as a temporary substitute for any other vehicle . . . which is out of normal use because of its . . . repair [or] servicing."

Midwestern argues that its "other insurance" or "excess" clause limits its exposure to the excess over the stated amount in Heritage's policy. The "other insurance" clause states:

> If there is other applicable liability insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance.

In other words, Midwestern would provide coverage in the event, and to the extent, that the damages exceeded

the policy limits of any other collectible insurance covering the accident.

This excess clause is to no avail. There is no "other applicable liability insurance" because, under the Heritage policy, David and Margery are customers who have other available insurance. We conclude that Midwestern has primary insurance responsibility.[1]

*By the Court.*—Judgment reversed.

[1]The parties entered into a posttrial stipulation which addressed, among other things, Heritage's and Midwestern's respective obligations in the event that Heritage took an appeal and prevailed.