Charles J. WILLIAMS, Plaintiff-Appellant,

v.

STATE FARM FIRE & CASUALTY COMPANY, Defendant-Respondent.

Court of Appeals

*No. 93–0144. Submitted on briefs July 21, 1993.—Decided November 11, 1993.*

(Also reported in 509 N.W.2d 294.)

For the plaintiff-appellant the cause was submitted on the briefs of *Randall Skiles* of *Stern, Skiles & Ward* of Madison.

For the defendant-respondent the cause was submitted on the brief of *Mark W. Pernitz* and *Mark J. Steichen* of *Boardman, Suhr, Curry & Field* of Madison.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J.   Charles Williams appeals from a summary judgment dismissing his action against his liability insurer, State Farm Fire and Casualty Company. He sued State Farm after the company declined to defend him in a lawsuit arising out of his ownership interest in a Texas apartment complex and he was forced to finance the defense on his own. He sought recovery of those expenses.

State Farm moved for summary judgment dismissing the action, arguing that Williams's involvement in the apartment venture was a "business pursuit" which, under the two policies State Farm had sold him, is specifically excluded from coverage. The trial court granted the motion and Williams appeals.

The issues are: (1) whether the business pursuits exclusions in the two policies apply to Williams's "passive investment" in the apartment enterprise; and (2) whether the circumstances surrounding State Farm's issuance of one of the policies constitute grounds for reformation of that policy so as to provide coverage. We resolve both issues in favor of State Farm and affirm the judgment.

The facts are not in dispute. Williams held two State Farm policies: a homeowners policy and a personal liability umbrella policy issued in 1971. The homeowners policy excluded coverage for injury or damage arising out of "business pursuits" and defined "business" as "a trade, profession or occupation." The umbrella policy contained similar language: it excluded coverage for losses caused by "business operations," defining business as "[a] trade, profession or occupation . . . ."

Williams, a certified public accountant, is chairman of the board of directors of Wisconsin Mutual Insurance Company and has served as chief executive officer of the company in the past. From 1973 to 1977, he was also an investor in an apartment complex in Whitewater, Wisconsin.

In 1979, Williams became a joint venturer in an apartment building in Texas. While the State Farm agent who sold Williams the umbrella policy in 1971 was aware of his involvement in the Texas venture, Williams never inquired about purchasing coverage from State Farm for the Texas property (which was insured by another company).

Williams's association with the apartment venture ended when the venture encountered financial difficulties and the building was repossessed by its creditors. Sometime thereafter, a serious accident, in which a

woman died, occurred at the building. Her family sued Williams and his coinvestors, claiming that the accident was caused by negligence in repairing the building during their ownership. Because there was no longer any underlying insurance in force on the property, Williams had to personally finance his defense of the action when State Farm refused to defend.

He argues on appeal that the business pursuit exclusions do not apply and, if we conclude that they do, we should reform the umbrella policy to provide coverage because of the circumstances surrounding its issuance.

## I. BUSINESS PURSUITS

When reviewing the trial court's grant of summary judgment, we apply the standards set forth in sec. 802.08, Stats., in the same manner as the trial court. *Bantz v. Montgomery Estates, Inc.*, 163 Wis. 2d 973, 977, 473 N.W.2d 506, 508 (Ct. App. 1991). Summary judgment is appropriate when there is no genuine issue of material fact and only questions of law are at issue. *Id.* at 978, 473 N.W.2d at 508.

There is no material dispute of fact with respect to whether Williams's Texas investment was a "business pursuit" within the meaning of the policy exclusions. The issue thus raised is one of contract interpretation — a question of law which we review *de novo. Bartel v. Carey*, 127 Wis. 2d 310, 313, 379 N.W.2d 864, 866 (Ct. App. 1985).

Insurance contracts are controlled by the same rules of construction we apply to other contracts. *Bertler v. Employers Ins. of Wausau*, 86 Wis. 2d 13, 17, 271

N.W.2d 603, 605 (1978). While policy provisions tending to limit liability must be construed against the insurer, a policy may not be construed to bind the insurer to a risk that it did not contemplate and for which it received no premium. *Bartel*, 127 Wis. 2d at 314-15, 379 N.W.2d at 866.

The Wisconsin Supreme Court examined the business pursuit exclusion in *Bertler*, where an employee, who was struck by a forklift operated by a coworker, sued the coworker's homeowners liability insurer to recover his damages. The issue was whether the coworker's operation of the forklift in the course of his employment constituted a "business pursuit" within the meaning of the policy exclusion. The court held that it did, noting that in construing the extent of the business pursuit exclusion, "[t]he intended role of [homeowners and personal liability] coverages should be kept in mind" because "[t]he nature and purpose of the policy as a whole has an obvious bearing on how far the insured could reasonably expect the scope of the exclusion to extend and whether the risk . . . is one the insurance company . . . contemplated (or should have contemplated) in computing its rates." *Bertler*, 86 Wis. 2d at 18-19, 271 N.W.2d at 606.

The court concluded that homeowners and personal liability policies were never intended to provide coverage for the "hazards associated with regular income-producing activities":

> The . . . personal liability policy . . . is designed to insure primarily within the personal sphere of the policyholder's life and to exclude coverage for hazards associated with regular income-producing activities. . . . [T]he hazards of . . . income-producing activities are diverse and involve different legal duties and a greater risk of injury or property dam-

227

age to third parties than personal pursuits. Business activities can be insured by other types of policies. Their exclusion from personal liability policies avoids areas requiring specialized underwriting, prevents unnecessary coverage overlaps, and helps keep premiums low. *Bertler*, 86 Wis. 2d at 20, 271 N.W.2d at 606-07 (quoting Frazier, *The Business-Pursuits Exclusion Revisited*, 1977 INS. L.J. 88, 88-89).

The *Bertler* court then adopted a two-part test for the type of "business pursuit" covered by exclusions such as those at issue here:

> To constitute a business pursuit, there must be two elements: first, continuity, and, secondly, the profit motive; as to the first, there must be a customary engagement or a stated occupation; and, as to the latter, there must be shown to be such activity as a means of livelihood, gainful employment, means of earning a living, procuring subsistence or profit, commercial transactions or engagements. *Bertler*, 86 Wis. 2d at 21, 271 N.W.2d at 607.

Applying the *Bertler* test in a later case, we held that a band's use of a van and trailer to haul its instruments from engagement to engagement was a business pursuit triggering the exclusion. *Bartel*, 127 Wis. 2d at 315-16, 379 N.W.2d at 866-67.[1]

---

[1] In *Bartel*, the plaintiff conceded that when a band performs, it is engaged in a business pursuit. The dispute focused on whether the activities of "hitching the equipment trailer to the band's van and traveling to the next engagement" were too remote from the band's profit-making activities to "arise out of business pursuits." *Bartel*, 127 Wis. 2d at 315, 379 N.W.2d at 866. We concluded that they were not. *Id.* at 318, 379 N.W.2d at 868.

We reach a similar conclusion here. Where an activity evinces both "continuity" and "profit motive," it is a business pursuit within the meaning of the exclusion, and we believe Williams's Texas activities fit the definition. He had invested in real estate in the past, and he invested in the Texas property on a continuing basis from 1979 until 1986, when the property was repossessed; for those seven years, he was exposed to liability as an owner of the commercial property. Nor is there any dispute that Williams became involved in the venture as a means of pursuing income and profit; the fact that the property eventually failed to be profitable is of no consequence.

Williams contends that his Texas investment does not fit the business pursuit definition. He points to the *Bertler* court's discussion of the concept of "continuity" as a "customary engagement or . . . stated occupation" and its description of "profit motive" as "a means of livelihood [or] gainful employment," *Bertler*, 86 Wis. 2d at 21, 271 N.W.2d at 607, and he argues that the business pursuits exclusion must thus be limited to activities undertaken in the insured's principal occupation as opposed to a mere "passive investment," such as his involvement in the Texas venture. We reject the argument.

First, the *Bertler* court explicitly adopted the two-part business pursuit test, noting that it has been "overwhelmingly followed in . . . jurisdictions . . . address[ing] the issue." *Id.* at 22, 271 N.W.2d at 607. And, in construing the policy language, the *Bertler* court concluded that the definition of "business" in the policy at issue in that case, as a "trade, profession or occupation" — the identical language used in Williams's policies — was stated in "broad terms" evincing

229

an "expansive definition" of the word "business." *Id.* at 20, 22, 271 N.W.2d at 607, 608.

Second, we note Professor Appleman's statement reflecting the rule followed by a majority of courts considering the issue: "The business need not be the [insured's] sole occupation" in order for the exclusion to apply, and that "part-time business activities are [also] excluded under comprehensive personal liability policies." 7A J. APPLEMAN, INSURANCE LAW & PRACTICE sec. 4501.10 (1979).[2]

Williams, however, refers us to several cases, from other jurisdictions, which he characterizes as "[finding] investment or part-time activities to be covered under [homeowners and personal liability] policies, and the business pursuits exclusion inapplicable." We find the facts and applicable law in those decisions to be distinguishable.[3]

---

[2] Williams asserts that adopting the view that "any investment is a business and therefore excluded would arguably exclude from coverage any accident occurring at the insured's home," because home ownership necessarily includes both continuity and an expectation of appreciation or profit motive.

The argument fails, as State Farm points out, for at least two reasons. First, the primary motive for home ownership is shelter, not profit. Second, an insured's residence is expressly listed as the insured location in homeowners policies and most personal liability umbrella policies.

[3] Two of the cases cited by Williams involved activities which were hobbies, as opposed to business pursuits. *See Shelter Mut. Ins. Co. v. Smith*, 779 S.W.2d 149 (Ark. 1989) (insureds' horse racing was "a pastime, primarily for their own enjoyment, and not a business pursuit"); *Nicholson v. First Preferred Ins. Co.*, 618 S.W.2d 560 (Tex. Ct. App. 1981) (insureds' interest in car racing was "mostly hobby" and not a commercial business). Other cases cited by Williams employed a narrow construction of "business pursuits" based on dictionary definitions, as

Indeed, we are persuaded by cases from other jurisdictions that Williams's investment in the Texas property was a business pursuit. In *Grossman v.*

opposed to the definition adopted by the Wisconsin Supreme Court in *Bertler. See Brown v. Peninsular Fire Ins. Co.*, 320 S.E.2d 208 (Ga. Ct. App. 1984) (real estate broker involved in developing land where bulldozer accident occurred was not involved in a business pursuit because "[h]e was not 'customarily engaged in' property development as his 'usual commercial or mercantile activity' ") (four justices dissenting as to definition of business pursuit); *Southern Guar. Ins. Co. v. Duncan*, 206 S.E.2d 672 (Ga. Ct. App. 1974) (spare-time race car driving not a business pursuit as insured was auto mechanic by trade). In another case, *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855 (Ky. 1992), the court employed a restrictive definition of "business" to conclude that the insured's venture was "woefully insufficient" to qualify as a business pursuit. *Id.* at 859. As indicated, however, we find the reasoning of contrary cases, taken in light of *Bertler*, to be more persuasive. We note, too, that in *Eyler*, three judges dissented as to the definition of a business pursuit, employing the continuity and profit motive definition adopted by the Wisconsin Supreme Court in *Bertler*.

Williams also relies upon *Brickell v. United States Fire Ins. Co.*, 436 So. 2d 797 (Miss. 1983), and *American Motorist Ins. Co. v. Steffens*, 429 So. 2d 335 (Fla. Dist. Ct. App. 1983). We think both are distinguishable. The *Brickell* court determined that the policy language defining a business as including a trade, profession or occupation was vague and ambiguous — narrowly interpreting the business pursuit exclusion in favor of the insured. *Id.* at 800-01. As indicated, the *Bertler* court determined that the policies defined the term business "broad[ly]." In *Steffens*, the court found that the insured had "long since" abandoned the business pursuit element of a venture involving the construction of a canal from where the injury arose. *Steffens*, 429 So. 2d at 337. Here, of course, the negligence giving rise to the Texas action allegedly occurred when Williams and his associates owned the apartment complex.

*American Family Mut. Ins. Co.*, 461 N.W.2d 489 (Minn. Ct. App. 1990), members of a limited partnership were sued on several counts relating to an apartment complex owned by the partnership. When the limited partners attempted to tender the defense of the suit to their liability insurers, the insurers denied coverage.

The *Grossman* court concluded that the business pursuits exclusions contained in the partners' personal policies precluded coverage for their limited partnership activities. Noting that the limited partners operated the apartment complex for profit, the court observed that "[p]remiums for homeowner's policies would be inflated unreasonably if the homeowner's insurance pool were required to assume risks attendant upon commercial ventures such as this." *Id.* at 496. Courts in other jurisdictions have reached similar conclusions.[4]

■ We conclude, therefore, that the trial court correctly ruled that Williams's investment in the Texas property was a business pursuit within the meaning of the policy exclusions.

---

[4] Several courts have also held that, in situations similar to Williams's, the exclusion applied to those activities which are not the stated occupation of the insured. *See Shapiro v. Glens Falls Ins. Co.*, 47 A.D.2d 856 (N.Y. App. Div. 1975), *aff'd*, 347 N.E.2d 624 (N.Y. 1976) (exclusion applicable to a limited partner's investment in real estate because "for purposes of the 'business pursuits' exclusion, the 'business' engaged in by [the insured] need not necessarily be limited to his *sole* occupation or employment); *Insurance Co. of Ill. v. Markogiannakis*, 544 N.E.2d 1082 (Ill. App. Ct. 1989) (professional musician's activity of renting an investment property over a continuous three-year period was a business pursuit because it was "a continuous or regular activity, done for . . . profit" even though it was a "part-time or supplemental income activit[y]").

## II. REFORMATION

Williams also argues that the trial court erred in granting summary judgment to State Farm because a factual question exists as to whether the umbrella policy should be reformed to provide coverage.

Williams purchased the umbrella policy in 1971, informing the State Farm agent that he wanted "full coverage, whatever we had." At the time of the purchase, Williams owned no real estate other than his residence. However, his wife was a member of a joint venture which owned a Madison apartment building, and Williams was assured that as long as underlying insurance was in force on the property, any liability she encountered would be covered by the umbrella policy.

Williams first contends that because he told his State Farm agent that he wanted "no holes" coverage when he purchased the 1971 umbrella policy, the policy should be reformed to cover his liability. He also claims that because the State Farm agent told him that his wife's investment was covered, the policy should be reformed to cover his later investment in the Texas apartment building. We are not persuaded.

An insurance policy may be reformed because of mutual mistake when it does not contain the provisions intended by the parties to be included. *Ahnapee & W. Ry. v. Challoner*, 34 Wis. 2d 134, 137, 148 N.W.2d 646, 648 (1967). The party seeking to reform the policy must present clear and convincing evidence that through inadvertence, accident or mutual mistake the contract of insurance does not set forth the intention of the parties. *Id.*

Because, however, those purchasing insurance must rely on the agent to provide the desired coverage,

we have held that "[i]n insurance cases less is required to make out a cause of action for reformation than in ordinary contract disputes." *Artmar, Inc. v. United Fire & Casualty Co.*, 34 Wis. 2d 181, 186, 148 N.W.2d 641, 643 (1967). Thus, "[a] mistake due to the negligence of an agent . . . is satisfactory ground for reformation, since the insured ordinarily relies upon the agent to set out properly the facts in the application." *Id.* at 187, 148 N.W.2d at 644. Williams argues that his agent was negligent because despite his direct statement to the agent that he wanted "no holes" coverage, the agent drafted a policy that, as it turned out, did not cover Williams's future real estate investments. Williams has not persuaded us that the agent was negligent in this case.

Williams relies heavily on *Artmar*, where an insured requested coverage for a piece of property which had several outbuildings located on it. Although the insured intended to purchase coverage for the outbuildings, he could not positively assert that he had requested coverage for them. After a fire destroyed one of the outbuildings, the insured filed a proof of loss with the insurer to recover the property damages. The company denied liability, claiming that the policy did not include coverage for the outbuildings.

The supreme court affirmed the trial court's denial of the insurer's motion for summary judgment. The court noted that the insurance agent had previously issued a separate policy for the property, which provided full coverage for the main dwelling and ten percent for the outbuildings. Because the same agent drafted the earlier policy providing coverage for the outbuildings, the court concluded that "[the agent] knew that [the insured] desired some insurance cover-

234

age on the outbuilding[s] . . . ." *Artmar*, 34 Wis. 2d at 190, 148 N.W.2d at 645.

Williams's situation is unlike that in *Artmar* because there is no evidence that Williams's State Farm agent knew that he desired coverage on the Texas property. Indeed, Williams did not become involved in the Texas venture until eight years after he purchased the umbrella policy. The Texas investment was plainly "a risk which [the insurance company] did not contemplate and for which it received no premium." *Bartel*, 127 Wis. 2d at 314-15, 379 N.W.2d at 866. And Williams never requested coverage for the Texas property. Sometime after purchasing the property, he informed the agent that, like both his and his wife's previous real estate investments, the property was insured through another company.[5]

Nor is there any evidence in the record indicating that State Farm intended to cover the Texas property. As the company points out, had its agent intended to write a policy that covered the Texas property, he would have had to contact the regional office in Texas for authorization to write an out-of-state policy. Moreover, coverage for a large apartment complex would have to be written as a commercial policy, and the agent never discussed a commercial policy with Williams. The Texas property was never listed as an additional insured location on the homeowners policy, nor was any primary insurance for the property listed on the declarations page of the umbrella policy.

---

[5] In fact, Williams understood that his personal liability umbrella policy did not provide any excess coverage unless satisfactory underlying insurance was in force. There was no underlying insurance in place for the Texas property when the Texas claim arose.

Under these circumstances, we conclude that there was neither a mutual mistake nor any negligence on the part of the State Farm agent. Reformation is allowed where "the party applying for insurance states the facts to the agent and relies on [the agent] to write the policy, which will protect his interests, *and the agent so understands*, but fails by mistake to so write the contract . . . ." *Artmar*, 34 Wis. 2d at 187, 148 N.W.2d at 644 (emphasis added). We see no grounds for reformation.

*By the Court.*—Judgment affirmed.